AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 19 - 8182 - DLB |
| DANIEL JAMES SUMMERS, | ) | |
| THOMAS PATRICK HANFORD, | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

FILED BY ___SP___ D.C.

MAY 0 3 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____01/07/2015 - 12/05/2017_____ in the county of _____Palm Beach_____ in the

_____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371 and 2314 | Conspiracy to transport stolen goods in interstate commerce. |
| 18 U.S.C. §§ 371 and 2315 | Conspiracy to sell stolen goods after transportation in interstate commerce. |
| 18 U.S.C. §§ 371 and 1832 | Conspiracy to possess stolen trade secrets. |
| 18 U.S.C. § 1956(h) | Conspiracy to launder money. |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Roald Novales, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____5 - 3 - 2019_____

_____
*Judge's signature*

City and state: _____West Palm Beach, FL_____

Dave Lee Brannon, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF SPECIAL AGENT ROALD NOVALES

I, ROALD NOVALES, hereby swear and affirm as follows:

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have so been employed since 2002.   During my tenure, I have been assigned to FBI-San Diego and FBI-Miami Field Offices where I have worked investigations targeting international drug trafficking, violent street gangs, money laundering, inter-state transportation of stolen goods, white-collar fraud and national security matters.   Currently, I am assigned to FBI-Miami's West Palm Beach Regional Office where I attend to national security matters.   During my seventeen (17) years as a Special Agent with the FBI, I have been involved in various criminal investigations across a broad array of violations which have sought prosecution in both State and Federal courts.   From 2013-2018, I investigated health care matters affecting both the private insurance sector and government sponsored programs, to include fraud schemes committed against Centers for Medicare Services (CMS), investigations which involved the U.S. Department of Health and Human Services (HHS) and the Food and Drug Administration (FDA).

2.     The facts contained in this affidavit are based on my personal knowledge and investigative observations, information obtained from Cooperating Informants (CIs) and other individuals who have been interviewed, as well as facts related to me by other agents and law enforcements officials.

3.     I have prepared this affidavit in support of a complaint charging Daniel James Summers (SUMMERS), aka "Jonathan Taylor," and Thomas Patrick Hanford (HANFORD), aka "Patrick James," with conspiracy to violate federal criminal statutes 18 U.S.C. § 2314, interstate transportation of stolen property, 18 U.S.C. § 2315, sale of stolen goods, 18 U.S.C. § 1832, possession of stolen trade secrets, and 18 U.S.C. § 1956(a)(1)(B)(i), money laundering.   This

affidavit does not contain all the facts of this investigation known to me or to other law enforcement officials.   Rather, it sets forth only those facts necessary to establish probable cause to issue the requested complaint.

**Background**

4.      The victim of the offenses under investigation is Victim 1. Victim 1 is a subsidiary of a multinational company. It was previously owned by several other parent companies and has changed its name several times, including during the course of the offense conduct.   In this affidavit, I will refer to the victim company and all its corporate predecessors as Victim 1.

5.      Victim 1 manufactures equipment used to perform ophthalmological laser surgery, commonly known as LASIK.   Victim 1 provides equipment for use in performing LASIK surgery to ophthalmologists.   Victim 1 enters sales or lease agreements and patent license agreements with the ophthalmologists who use its equipment.   These patent license agreements require the ophthalmologist to use a key card to activate the machinery each time the ophthalmologist uses the equipment to perform surgery.   The purchase of the key card provides a per-use license to use Victim 1's patented LASIK technology.   Victim 1 sells these key cards to ophthalmologists.   The technology on the key cards provide a specific number of LASIK eye surgeries "credits" that are purchased by the doctors using the LASIK machine.   A Victim 1 key card consists of a physical plastic card (similar to a credit card) with embedded integrated circuits and software programmed thereon.   On June 22, 2017, Victim 1 counsel identified 55 patents that are licensed to ophthalmologists who use Victim 1's LASIK equipment and treatment cards.   According to Victim 1's counsel, as of June 22, 2017, 47 of these patents were expired and eight remained active.

2

6.      Victim 1's machines are capable of different types of laser eye surgery.   Victim 1 sells separate treatment cards for each type of procedure.   The procedures that can be performed include VisionKey, also known as Standard, surgery; Custom surgery, and I-Design surgery.

7.      Before the key cards can be used to activate a Victim 1 LASIK machine, the cards must be programmed.   A first level of programming is carried out by the vendor from which Victim 1 buys the cards. Victim 1 personnel carry out a second level of programming, using inexpensive, off-the-shelf personal computers and card-reading equipment.   However, the software used to program the cards was designed by Victim 1 in conjunction with one of its vendors, SCB Solutions, all of which is proprietary.   It is not available to anyone outside Victim 1.   In addition, each LASIK machine is serialized and a treatment key which has been programmed to be used on that particular LASIK machine will not function on any other LASIK machine manufactured by Victim 1.   This treatment card system is proprietary to Victim 1.   The investigation has revealed no other commercially available treatment card system like the one Victim 1 and its vendors have designed and implemented.

8.      The second-level programming requires the use of a master card called a SAM-E card.   Like a key card, a SAM-E card is the size as a credit card and contains an embedded smart chip.   Victim 1's proprietary software will not allow a key card to be programmed unless a SAM-E card is inserted into the computer at the time the software is run.   Victim 1 also uses a second type of master card, a SAM-C card, to operate its key card system.   The SAM-C card is physically embedded inside a Victim 1 LASIK machine and keeps track of the machine's serial number.   A person does not need to have a SAM-C card to program a treatment key card.

9.      Individual 1 is an ophthalmologist who practices in Boca Raton, in the Southern District of Florida.   He uses Victim 1 LASIK equipment in his practice.   In November and

December 2016, Special Agent (SA) Maximillian Pagano, Office of Criminal Investigations, Food and Drug Administration, and myself, interviewed a cooperating informant (CI-1) regarding the activities of Individual 1. CI-1 witnessed the activity at Individual 1's Boca Raton office from approximately January through July 2016. CI-1 observed Individual 1 in possession of several "counterfeit black cards" that Individual 1 used in place of the approved Victim 1 white key cards.

10.    Individual 2 is an ophthalmologist who practices in Las Vegas, Nevada. Individual 2 uses Victim 1 LASIK equipment at that location. Special Agent Pagano and myself have spoken to a separate cooperating witness, hereafter referred to as "CI-2," who previously worked for Individual 2 at his Las Vegas practice. On March 27, 2017, CI-2 reported that he had met individuals whom he knew as "Patrick" and "Jonathan" through Individual 2, approximately one and a half to two years earlier. CI-2 provided SA Pagano and myself with two key cards that "Patrick" had provided Individual 2 and that Individual 2 had already used. These cards match CI-1's description of the counterfeit cards that CI-1 saw at Individual 1's office. CI-2 stated that when "Patrick" arrives at Individual 2's office to deliver the counterfeit cards, he will only give a few days prior notice and is paid in cash by Individual 2 for the counterfeit LASIK cards. CI-2 said that "Patrick" told Individual 2 and CI-2 to "hide the cards" and to also buy legitimate LASIK cards from Victim 1 every once in a while to give them the impression that Individual 2 office was still ordering legitimate cards. CI-2 has personally witnessed "Patrick" and "Jonathan" deliver counterfeit LASIK cards to Individual 2's office. "Jonathan" told CI-2 he used to work for Victim 1. "Jonathan" added that he was one of the engineers who made the key cards at Victim 1, but left the company over a contract disagreement with Victim 1 executives.

11.    Victim 1 representatives have previously informed SA Pagano and myself about a former employee, SUMMERS. SUMMERS oversaw the creation of the key card system in 2008-

4

2009 and had full access to the physical equipment that Victim 1 used to program the cards. SUMMERS had full access to these cards when he was an employee at Victim 1.   SUMMERS left Victim 1 in early 2015 after several unfavorable performance reviews.   According to a Victim 1 representative, a Victim 1 employee who knew SUMMERS stated that HANFORD was a friend of SUMMERS.

**SUMMERS's Efforts to Reverse Engineer Victim 1 Key Cards**

12.     On August 10, 2017, in case number 17-8337-DLB (SDFL), the Honorable Dave Lee Brannon, U.S. Magistrate Judge, signed a warrant authorizing a search of the email account dan.summers@outlook.com.     Pursuant to this warrant, we obtained Microsoft's subscriber information for the email account, which indicates that the account is assigned to "Dan Summers" at zip code 95051.   Searches of public and other records, including SUMMERS's driver's license records, indicate that SUMMERS lives at an address in Santa Clara, California with zip code 95051.

13.     SUMMERS's email account included correspondence between SUMMERS and Individual 3.   In his email signature line, Individual 3 describes him as a "highly innovative software architect."   On October 23, 2013, SUMMERS wrote to Individual 3 that he wanted to hire Individual 3 for a programming job involving the programming language JAVA.   The emails reveal that, on or shortly before October 27, 2013, SUMMERS gave Individual 3 a smart card with an embedded chip.   In one of his emails, Individual 3 described the card as a "VisionKey Card." Also in late October, Individual 3 sent several emails indicating he was expecting documentation from SUMMERS to help him understand how the card worked.   However, on January 26, 2014, SUMMERS told Individual 3 that he would prefer to go forward without the documentation "unless we run into a brick wall."   SUMMERS added, "The less I bring it up the better."

14.     On February 26, 2014, SUMMERS asked Individual 3 to buy cards with embedded chips. SUMMERS gave Individual 3 the name of a vendor from which he could buy the cards. SUMMERS explained that, if SUMMERS called the vendor, "they would know what I'm doing." Individual 3 declined to buy the cards, explaining that "it adds to much traceability" to him. Individual 3 added that it would be okay "[i]f I had a legitimate reason for using the cards . . . ." Individual 3 stated that he wanted to have "plausible deniability if any kind of lawsuit came into play."   That is the last email between SUMMERS and Individual 3 found in SUMMERS's account.

### JDT Solutions, LLC

15.     Individual 4 is a certified public accountant who prepares SUMMERS's tax returns. In April 2013, six months before SUMMERS contacted Individual 3, SUMMERS emailed Individual 4 that he wanted Individual 4's advice on a new business SUMMERS was starting. Then, from October 2014 through January 2015, after SUMMERS finished emailing with Individual 3, SUMMERS and Individual 4 exchanged a series of emails about the incorporation in Nevada of a business called JDT Solutions LLC.   On January 7, 2015, Individual 4 wrote that he wasn't sure they needed to set up a second corporation in Nevada, but that they would definitely want to set up a California LLC.   Individual 4 also said that he would be the only member of the Nevada LLC "since it is going to be a flush thru LLC anyway and it keeps your name off the rolls." On January 15, 2015, Individual 4 warned SUMMERS that it would "NOT" be a good idea to name the California company "JDTL Solutions."   Individual 4 explained that, if anyone were to look up JDT, that person would also find JDTL, "drawing instant attention to us."   Individual 4 also wrote that "I will start misdirection once we are up and rolling."

16.     JDT Solutions LLC was incorporated in Nevada on January 8, 2015.   Individual 4 was the managing, and only, member.   Its official corporate address was the address of the company that served as JDT's registered agent.   At least as far as my investigation has found, SUMMERS and Individual 4 did not incorporate any other businesses, despite their discussions about doing so.   On January 12, 2015, four days after incorporating JDT Solutions, Individual 4 opened a Wells Fargo bank account in the company's name.   Individual 4 was the only signatory. On January 14, 2015, Individual 4 opened a private mailbox in JDT Solutions' name in Reno, Nevada.   He submitted the notarized application by fax and FedEx.

17.     On January 27, 2015, SUMMERS's Bank of America credit card was used to buy HANFORD an airplane ticket on United Airlines.   On February 5, 2015 the card was used to buy SUMMERS a United Airlines ticket.

18.     On June 6, 2017, in case number 17-8203-WM (SDFL), the Honorable William Matthewman, U.S. Magistrate Judge, signed a warrant authorizing a search of the email account jdtsolutions@outlook.com.   As discussed later in this affidavit, HANFORD used this email address to communicate with CS-1.   Based on the email content received pursuant to the warrant, summarized in this affidavit, I believe that SUMMERS also sometimes used the JDT Solutions email account.

19.     On February 10, 2015, mrtht@yahoo.com forwarded an Expedia travel itinerary to the JDT Solutions email account.   Yahoo records indicate that the Yahoo account mrtht@yahoo.com is assigned to "Mr. Tom Hanford."   Furthermore, HANFORD included mrtht@yahoo.com in his contact information for a credit card.   According to the itinerary that HANFORD forwarded from his Yahoo account to the JDT Solutions account, HANFORD was scheduled to fly on a United Airlines flight from San Francisco to Tampa on February 10, 2015 and

to return on February 17, 2015.   In June 2017, United Airlines reported that it had no records of any travel by HANFORD.   However, I do not know how long United Airlines retains records of travel.

20.     Credit card and hotel records indicate that SUMMERS and a second person arrived at the Waldorf Astoria Boca Raton on February 12, 2015 and checked out the next day, February 13, 2015.   On February 15, 2015 SUMMERS' card was charged by the Doubletree Deerfield Beach.   The credit card records indicate an arrival date of February 13, 2015.   Also on February 15, 2015, SUMMERS' card was charged by Embassy Suites Boca Raton, with an arrival date of February 14.

21.     On Friday, February 13, 2015, SUMMERS emailed Individual 4 that he had a check for Individual 4.   On Monday, February 16, the JDT Solutions email account sent an email to Individual 1.   The email was signed by "Patrick James" and "Johnathan [sic] Taylor" and read, "We wanted to thank you again for your time, and look forward to assisting you with future needs. If you still want a standard card as well we can have one sent to you within 3-5 business days." On February 18, 2015, an $8,000 check from Individual 1's business account was deposited to JDT's bank account.   The check was deposited in Santa Clara, California.   The check was dated February 13, 2015 and made out to JDT Solutions.   The memo line read, "laser cards."

22.     On March 11, 2015, Individual 4 signed a check to HANFORD for $1648.60. HANFORD deposited the check into his personal bank account.   On April 21, 2015, Individual 4 signed a check to SUMMERS for $6,000.   The memo line read, "consulting." SUMMERS deposited the check into his personal bank account.   At that point, the JDT Solutions account was almost empty.

8

23.     GoDaddy.com, LLC is a domain registrar that registers Internet domain names (names that can be used as addresses on the World Wide Web) on behalf of its customers. GoDaddy records indicate that, on April 24, 2015, GoDaddy registered the domain name jdtsolutions.net on behalf of HANFORD.   On April 24, 2015, GoDaddy sent an email to HANFORD's Yahoo account confirming the registration of the domain name.   HANFORD forwarded GoDaddy's email to the JDT Solutions account with the message, "I also paid an extra fee to disguise the creator of the website, so if people do a search to see who ctrated [sic] that info will not be accessible[.]"

24.     On November 21, 2015, SUMMERS emailed Individual 4 that he had another check for Individual 4.   Two days later, in San Jose, a $6,000 check from Individual 1's business account was deposited in the JDT Solutions account.   Individual 1's check was dated November 12, 2015. The memo line on the check read "consulting services."   Individual 1's two checks, discussed in this affidavit, were the only deposits into the JDT Solutions account except a small deposit made when the account was opened.

25.     On November 25, 2015, two days after the deposit of Individual 1's second check, Individual 4 wrote checks from the JDT Solutions account to SUMMERS, HANFORD, and himself (Individual 4) for $2,025 each, essentially emptying the account.

26.     On January 23, 2016, SUMMERS sent an email from his Outlook email account to the JDT Solutions email account.   The email appears to be draft language of an email to be sent to a "Dr. McCree." "McCree" is probably Dr. William E. McRee, an ophthalmologist in California who is a customer of Victim 1.   The draft email requests, "If paying by check is your only option than [sic] I would ask you to add 'Consulting Service' in the notes line of the check." SUMMERS's draft was found in the "Trash" folder of JDT Solutions' account.   No similar email

was found in JDT Solutions' Sent Items folder and I do not know whether the draft email was ever sent to McRee (McCree).

### Investigation by Cooperating Source

27.     Beginning in March 2017, I conducted an investigation of HANFORD and SUMMERS with the cooperation of CI-1, the former employee of Individual 1 who is discussed above.   CI-1 has been paid several thousand dollars for his/her cooperation, in addition to reimbursement for his/her expenses.   Before CI-1 began assisting this investigation, CI-1 had not met nor communicated with neither SUMMERS or HANFORD.

28.     Between March and October 2017, CI-1 and HANFORD communicated by email, text message, telephone calls, and in person.   In CI-1's communications with HANFORD, HANFORD introduced and referred to himself as "Patrick James."   In all their email communications, HANFORD used the JDT Solutions email account.   CI-1 represented to HANFORD that CI-1 was a business associate of CI-2 and that he/she wanted to buy key cards from HANFORD.

29.     On March 31, 2017, HANFORD offered CI-1 key cards which allowed the user to conduct LASIK eye surgery using Victim 1 equipment at a fraction of the cost compared to when the key cards were bought directly from Victim 1.   HANFORD described his cards as "identical Java based cards."   HANFORD explained that Victim 1's "patent" had expired and this was the reason why HANFORD and his associate(s) were able to sell these key cards at a fraction of Victim 1's price.

30.     On April 1, 2017, HANFORD texted CI-1 that "we would like to remain 'under the radar' if you know what I mean.   So just proceed with caution, there's docs [doctors] that are down and obviously docs that are not.   We're not looking to get big, quality of [sic] quantity!"

10.     On April 4, 2017, CI-1 advised HANFORD over email that CI-1 had a doctor in South Florida interested in purchasing HANFORD's cards.   On April 5, 2017, HANFORD advised via email he would be able to send "sample" key cards.   HANFORD reminded CI-1 to keep all of this on the "down low" and that HANFORD and associate(s) wanted to keep it "small."

11.     On April 13, 2007, HANFORD and CI-1 spoke via telephonic call.   HANFORD and CI-1 discussed how HANFORD's key cards were loaded with 100 treatments vs. the 2 or 10 treatments typically sold by Victim 1.   HANFORD stated that the price of his key cards was $8,000 (USD) if paid in cash and $10,500 (USD) if paid by check.   HANFORD again mentioned that the reason why he and his associate(s) were able to sell these key cards was because Victim 1's patent had expired.

12.     On April 17, 2017, a UPS package was delivered to an address in Miami-Dade County, in the Southern District of Florida, that CI-1 had provided HANFORD.   UPS records indicated that the package was sent on April 14, 2017 from San Luis Obispo, California. HANFORD lives in Avila Beach, California, which is about ten miles from San Luis Obispo.   The package contained one treatment card capable of authorizing ten Custom treatments on a Victim 1 LASIK machine.   Previously, CI-1 had provided HANFORD a specific serial number belonging to a Victim 1 LASIK machine.   Similarly, in all cases discussed in this affidavit in which HANFORD provided treatment cards to CI-1, CI-1 first provided the required serial number(s). An FBI forensic examination found HANFORD's latent fingerprints on the treatment card in the UPS package and on a sleeve the card came in.

13.     From late-April to mid-May, 2017, HANFORD and CI-1 had multiple conversations via telephonic calls, text messages and emails, where they arranged for HANFORD to send CI-1 two (2) additional sample treatment cards.

14.     On May 15, 2017, a FedEx package was sent from San Luis Obispo, California to the address that CI-1 had given HANFORD.   The package contained two (2) additional treatment cards, each of which was capable of authorizing twenty Custom treatments on the specific serialized Victim 1 LASIK machine which CI-1 had previously provided.   The cards were inside a standard white envelope, which were inside the FedEx envelope.   Forensic examination found HANFORD's latent fingerprints on the FedEx envelope and the white envelope.

15.     In emails in late May 2017, CI-1 negotiated with HANFORD over the price of additional treatment cards.   On May 22, 2017, HANFORD agreed to sell CI-1 treatment cards for 100 Custom treatments for $6,000 ($60 per procedure) and treatment cards for 100 Standard treatments for $5,000 ($50 per procedure).   According to a Victim 1 representative, the company's prices aren't the same for every doctor.   However, the company sells Standard treatment cards to Individual 1 and Individual 2 for $110 per procedure and Custom treatment cards for $245 per procedure.

16.     On June 6, 2017, in case number 17-8202-WM (SDFL), the Honorable William Matthewman, U.S. Magistrate Judge, signed a warrant authorizing tracking of the location of HANFORD's cell phone, the phone he had used to communicate with CI-1, for 30 days.   On June 28, 2017, in case number 17-8260-DLB (SDFL), the Honorable Dave Lee Brannon, U.S. Magistrate Judge, signed a warrant authorizing tracking of the location of HANFORD's cell phone for an additional 30 days.   On July 27, 2017, in case number 17-8304-WM (SDFL), Judge Matthewman signed a warrant authorizing tracking of the location of the cell phone for an additional 30 days.

17.     On June 8, 2017, HANFORD met CI-1 at a restaurant in Boca Raton, FL where HANFORD provided six (6) unauthorized treatment cards in exchange for $30,000 USD in cash. This meeting was consensually recorded by CI-1.   In total, these cards allowed the user(s) to

perform 300 Custom and 300 Standard treatments (surgeries) on Victim 1 LASIK machines. During the meeting, HANFORD stated that he and his "boss" "recommend" and "prefer" that doctors continue to buy treatment cards from Victim 1. HANFORD stated that the doctors have to think about service (factory scheduled maintenance).

18.     On Saturday, June 24, 2017, HANFORD informed CI-1 that HANFORD was shipping CI-1 twelve more treatment cards. Agents received a FedEx package on June 28, 2017 at the address that CI-1 had given HANFORD. FedEx records indicate that the package was shipped from Coopertino, California on June 24, 2017. SUMMERS lives in Santa Clara, California, which is near Coopertino. The package contained twelve (12) additional treatment cards, each of which was capable of allowing the user(s) to perform ten (10) Custom treatments on a Victim 1 LASIK machine. On June 24, 2017, tracking data showed HANFORD's cell phone at SUMMERS's residence. Later that day, HANFORD's cell phone traveled to Avila Beach, CA, where he resided.

19.     On June 28, 2017, in a phone conversation, HANFORD warned CI-1 that "these cards aren't for everyone. . . . [Y]ou have to be upfront with them that hey, these are black cards. You know what I mean? . . . There . . . could be some legality stuff you know, possibly, and depending on . . . whether or not the specific doctors' . . . patents are good or not." HANFORD added that he and SUMMERS might stop taking new clients in the new year because "we never did this to, to go super big. We always wanted . . . to kinda stay under the radar a little bit, right?"

20.     On July 28, 2017, a person identifying himself as "Jonathan" called CI-1 to discuss an upcoming meeting that HANFORD and CI-1 had planned in San Francisco, CA. During the conversation, "Jonathan" told CI-1 that he had worked at Victim 1. "Jonathan" was recruited to work at Victim 1 in the early 1990s and assigned to design a treatment card system for the company.

"Jonathan" explained that he was the "technical guy" and that HANFORD, whom he referred to as "Patrick," was in-charge of "operations/sales."   "Jonathan" explained that "this is a Java card. And what we've done is we've programmed it to emulate" Victim 1's treatment cards.   He claimed that "we basically reverse engineered what they had . . . "   He claimed to buy reprogrammable cards for $500 each.   He also claimed that he had spent "half a million" in inventory and "three quarters of a million" on design and that he had "a bunch of code jockeys" to emulate the Victim 1 cards.   "Jonathan" further stated that Victim 1's "patents for all previous stuff except for the I-Design" had expired.   He told CI-1 that "we had a . . . lawyer . . . look up all the patents," and that the lawyer told them "the sucker's free and clear except for I-Design stuff." "Jonathan" warned CI-1 that "we've got to be very quiet about, hush hush about" I-Design cards.

21.     On August 1, 2017, during a consensually recorded conversation, CI-1 met with HANFORD in San Francisco where HANFORD provided three sample key cards, each of which was capable of allowing the user(s) to conduct ten (10) Custom treatments on a specific serialized Victim 1 LASIK machine.   CI-1 provided HANFORD $20,000 as a down payment in connection to a $120,000 purchase for 24 treatment cards.   During the meeting HANFORD expressed concern as to what CI-1 was telling the doctors about the "black" treatment cards they were selling them. HANFORD told CI-1, "You know this is illegal," to which CI-1 acknowledged he/she was aware and told HANFORD that it stayed between them.

22.     On August 22, 2017, HANFORD contacted CI-1 using a new cell phone number. All HANFORD's subsequent telephone calls and text messages with CI-1 occurred using this new telephone number.   The following day, August 23, 2017, HANFORD advised CI-1 that law enforcement was investigating them in connection with the Victim 1 treatment cards.

14

23.     On or about September 17, 2017, HANFORD contacted CI-1 and asked CI-1 for CI-2's cell phone number.   HANFORD said that he had CI-2's phone number saved on his old cell phone, but HANFORD no longer has his old cell phone available.

24.     On October 7th, 2017, CI-1 met HANFORD at an airport hotel in San Francisco. At the beginning of the meeting, HANFORD asked CI-1 to lift his/her shirt, apparently so that HANFORD could be sure that CI-1 was not wearing a wire (consensual recording device) which CI-1 was in fact wearing but was not visible to HANFORD.   HANFORD said that, for the next six months, he would switch phones every six weeks to two months.   HANFORD gave CI-1 nineteen (19) treatment cards at this meeting.   Eighteen (18) of these cards were for CI-1 to sell to his/her customers.   In total, these 18 cards were capable of allowing the user(s) to perform 900 Custom and 900 Standard treatments on Victim 1 LASIK machines.   The last card was a sample card capable of allowing the user(s) to perform 50 I-Design treatments.   CI-1 gave HANFORD $15,000 in cash for the 18 cards, but still owed a balance.

25.     On October 26th, 2017, HANFORD traveled to Boca Raton where he meet with CI-1, who paid HANFORD $17,500 in connection to the transaction that had taken place on October 7th, 2017 in San Francisco.   This meeting was consensually recorded by CI-1.   During the meeting HANFORD stated he and "Jonathan" could not accept payment by check due to the investigation law enforcement was conducting.   HANFORD advised that the doctor in Las Vegas had not bought any legitimate key cards from Victim 1 in over a year.   CI-1 told HANFORD that he/she (CI-1) tells his/her doctors to maintain an 80/20 ratio, 80% "counterfeit" and 20% authentic Victim 1 cards.   HANFORD suggested CI-1 start off his/her doctors at 60/40, or even 70/30, but never 80/20.   HANFORD stated that they (HANFORD & SUMMERS) have always feared the greed of their customer, the doctors they sell these "black" cards to.   HANDFORD added that once the

15

doctors are identified by law enforcement, they (HANFORD, SUMMERS, and CI-1) are next.   CI-1 asked HANFORD if his/her doctors knew that these cards are counterfeit.   HANFORD replied, "You have to be brutally honest with them and say...you know what motherfucker!, these are illegal, this is fucking illegal."   HANFORD added that CI-1 should tell the doctors that they would not get in trouble.   HANFORD explained, "For them, they don't fuckin' know. You can play the stupid card and get away with anything you want."   In reference to "Jonathan," HANFORD told CI-1, "I think he (Jonathan/SUMMERS) purposely kinda keeps me in the dark a little bit 'cause the less I know, ya kno,...."

### Analysis of Key Cards

26.     As described above, CI-2 gave Special Agent Pagano two (2) treatment cards that Individual 2 had received from HANFORD.   SA Pagano gave these treatment cards to Victim 1 for analysis.   Victim 1 reported that each card had originally been configured to allow 100 treatments on Victim 1 LASIK machines.   However, in the presence of several Victim 1 senior management employees and myself, a Victim 1 employee removed the black paint on the front of the cards, and revealed Victim 1 artwork underneath it.   Therefore, Victim 1 representatives with whom I have spoken believe that the card may have been stolen from a Victim 1 facility.

27.     All the treatment cards that CI-1 received from HANFORD looked similar to the cards that SA Pagano received from CI-2.   They were black on one side and white on the other.   I removed the black paint on all these cards with solvent.   In each case, I found Victim 1's artwork underneath the paint.

28.     The black paint on most of the cards that HANFORD gave CI-1 looked at least reasonably professional.   However, the cards that HANFORD gave CI-1 on October 7, 2017 were wrapped together in a bundle.   The black paint on the fronts of the cards was smeared and cracked.

16

In some cases, black paint from one card had come off on the back of the next card, although Victim 1's artwork was not visible.   It appeared that the cards were bundled together when the paint was still wet.   An email from on March 24, 2017 suggests that this problem had occurred before.   The email was sent from the JDT Solutions account to that same account.   This appears to have been a method by which HANFORD and SUMMERS communicated with each other.   Based on the content of the email, I believe HANFORD wrote it to SUMMERS.   The email stated that "[o]nly one card came out OK,[ ] thinking they were still wet when put into sleeves." HANFORD said that he has a couple cards for one doctor, but "going to need ya to make another card for Philly."

29.     On August 3rd, 2017 and May 14, 2018, I interviewed Ronan Lapie (LAPIE), owner and operator of SCB Solutions (SCB), located in Arlington, Virginia.   SCB is the software vendor which created and developed the treatment card system together with Victim 1's in-house engineers which included SUMMERS.   LAPIE stated that the treatment cards are shipped from the manufacturer, CPI Card Group in Littleton, Colorado, directly to Victim 1's Milpitas, California facility, proximal to SUMMERS' residence.   I showed LAPIE the unauthorized "black" treatment cards that CI-1 had received from HANFORD.   The black paint had been removed from these cards, exposing Victim 1 logo and art work.   LAPIE advised that the cards were part of a 10,000 unit test batch which were never placed into circulation due to a defect in the art work on the card. LAPIE stated that, due to the multiple layers of encryption and two-stage coding the treatment cards require, it would practically impossible for a person to code the cards unless the person had access to software located in the card coding department at Victim 1's Milpitas facility. He added that "reverse" engineering was feasibly impossible due to the multi-bit encoding.   LAPIE stated SCB had never lost nor had been a victim of a theft involving Victim 1 blank treatment cards.   On

October 10th, 2017, Special Agent Pagano and I interviewed Tim Enright (ENRIGHT), Director of Global Security for CPI Card Group (CPI), located in Littleton, Colorado.   SCB contracts CPI to manufacture the cards based on the architecture and engineering SCB has designed.   CPI silk screens art work on one side of the card and codes it with the 1st level of programming.   The 2nd level of programming is conducted at Victim 1's facility.   CPI has no control over nor access to the 2nd level of programming and as such is unable to make the card function on any LASIK machine.   ENRIGHT stated that CPI has never lost or been a victim of theft involving Victim 1 blank treatment cards.   ENRIGHT further advised that even if someone was to get a hold of CPI's manufactured Victim 1 blank treatment cards, it would be near impossible to code them without having to Victim 1's proprietary coding software.   ENRIGHT and CPI staff were shown the same confiscated treatment cards previously shown to LAPIE.   ENRIGHT and CPI staff advised that the cards were part of a test batch manufactured by CPI on or about 2011 but were never placed in circulation.

30.   LAPIE provided copies of emails between himself, SUMMERS, and other employees of Victim 1 about the test batch of key cards.   On January 30, 2019, SA Pagano interviewed Sanjel Mishra (MISHRA), a former supervisor at Victim 1 who was a party to those emails.   MISHRA did not remember the test batch of cards.   However, he reported that Victim 1 practice was that non-performing products were either destroyed or returned to the vendor, and that the engineer in charge of the project made that determination.   In this case, MISHRA explained, SUMMERS was the engineer in charge of the project, so SUMMERS would have decided what to do with the misprinted cards.   On February 8, 2019, SA Pagano interviewed Mark Steen (STEEN), who was SUMMERS's supervisor at Victim 1 at the time that SUMMERS dealt with the test batch of cards.   STEEN did not remember the test batch of cards.   However, he stated that, in the case

of incorrect products delivered by a vendor, the product would either be returned to the vendor or, with the agreement of the vendor, it would be scrapped.   He stated that SUMMERS would have been a key person in deciding what to do with unacceptable key cards.

## Search Warrants

31.     On December 5, 2017, agents executed search warrants at SUMMERS's house, Individual 1's practice, and Individual 2's Las Vegas practice.

32.     In SUMMERS's garage, I found a spray can of black spray paint on top of a small worktable. On the floor next to the worktable, I found a key card. The key card was damaged; it looked like someone had tried to peel the Victim 1 logo off the card. It was not painted black. LAPIE later told me that the card had the corrected Victim 1 artwork on it.   It wasn't part of the 10,000-card test batch described above.

33.     In a desk drawer in the family room, agents found two black cards with serial numbers written on the back.   These cards looked similar to the treatment cards HANFORD gave CI-1.   LAPIE determined that these cards were from the test batch described above.

34.     In another drawer in the desk, agents found 11 thumb drives.   On two (2) of the drives, Victim 1 engineers found a copy of the proprietary software that Victim 1 uses to encode treatment cards.

35.     In the master bedroom closet, agents found four (4) more cards.   Two (2) of these cards were Victim 1 key cards.   They were not painted black.   LAPIE reported that one of these cards was from the test batch described above and the other was an ordinary card, with the corrected artwork.   The other two cards found in the closet were a SAM-E and a SAM-C master card.   As discussed above, a person needs a SAM-E card in order to program treatment cards.

19

36.     During the search, agents interviewed SUMMERS.   He said that he had worked at Victim 1 for ten years, until 2014.   He said he was familiar with the chip-embedded cards used by Victim 1's laser eye surgery machines.   He said he did not have these chip-embedded cards, nor had he taken them from his former employer.   He said that he had "never" spray-painted these cards.   He said that he had not programmed any cards since leaving his employer.   He said that programming the key cards would require a SAM-C card and a computer program, which could run on any computer.   He stated that no cards to operate the machines or SAM C cards were present at his residence.   As discussed above, Victim 1 has told SA Pagano and myself that programming a treatment card actually requires a SAM-E card, not a SAM-C card.   Both a SAM-C and a SAM-E card were found in SUMMERS's house.

37.     In January, 2018, I visited Victim 1's facility in Milpitas, CA where staff was able to program a blank treatment card pulled from their inventory with the SAM-E card seized at SUMMERS' residence during the December, 2017 search warrant.

38.     Individual 1 voluntarily turned over two black-and-white treatment cards to agents searching his office.   In addition, Victim 1 technicians gave agents instructions on how to download from Individual 1's LASIK machine data regarding the key cards that had been used in the machine.   A Victim 1 technician then analyzed the data.   The data shows that Individual 1 used eight unauthorized treatment cards in his machine, four Standard cards and four Custom.   Each of these cards originally authorized 100 treatments.   Individual 1 first use of an unauthorized treatment card, a Custom card, was on February 13, 2015.

39.     At Individual 2's office, agents seized two black treatment cards.   Agents also downloaded treatment-card data from Individual 2's machine.   The data showed that Individual 2

20

used 15 unauthorized Standard treatment cards and 20 unauthorized Custom treatment cards, each

of which authorized 100 treatments.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

ROALD NOVALES, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATIONS


SWORN AND SUBSCRIBED TO BEFORE ME
ON THIS _____ DAY OF MAY, 2019, IN WEST
PALM BEACH, FLORIDA:


HONORABLE DAVE LEE BRANNON
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.  19-8182-DLB

**UNITED STATES OF AMERICA**

**vs.**

**DANIEL JAMES SUMMERS,**
**THOMAS PATRICK HANFORD,**

      **Defendants.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  _____ Yes   __X__ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?
_____ Yes   __X__ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____

MARC OSBORNE
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5500796
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel:   (561) 820-8711
Fax: (561) 820-8777
MOsborne@usa.doj.gov